IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CAROLYN THOMAS HARRISON,
     Plaintiff,

vs.                                 Case No. 3:09cv509/LAC/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

     Plaintiff's application for DIB, filed May 20, 2004, was denied initially and on reconsideration (Tr. 26, 71–72, 73–76).[1] On May 30, 2008, following a hearing and two supplemental hearings, an administrative law judge ("ALJ") issued a decision in which he found that

---

[1] All references to "Tr." refer to the transcript of the Social Security Administration record filed on February 11, 2010 (Doc. 8). Moreover, the page numbers refer to those found on the upper right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

Plaintiff was not under a disability as defined in the Act (Tr. 37–40). On February 5, 2009, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 9–11). Thus, the decision of the ALJ stands as the final decision of the Commissioner, now subject to review in this court. <u>Ingram v. Comm'r of Soc. Sec. Admin.</u>, 496 F.3d 1253, 1262 (11th Cir. 2007); <u>Falge v. Apfel</u>, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II.     FINDINGS OF THE ALJ

In his May 30, 2008, decision, the ALJ made the following findings relative to the issues raised in this appeal (*see* Tr. 26–40):

1)     Plaintiff meets the insured status requirements of the Act through December 31, 2008.

2)     Plaintiff has not engaged in substantial gainful activity since November 19, 2003, the date she alleges she became disabled.

3)     Plaintiff has the following severe impairments: status post partial meniscectomy of the left knee with mild residual degenerative changes and minimal spurring, multi-level degenerative disc disease of the lumbar spine, and morbid obesity.

4)     Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)     Plaintiff is unable to perform her past relevant work.

6)     Plaintiff was born on October 8, 1958, and was forty-five years old on the date she alleges she became disabled.

7)     Plaintiff has at least a high school education and is able to communicate in English.

8)     Transferability of job skills is not an issue in this case because Plaintiff's past relevant work is unskilled.

9)     Plaintiff is able to perform work at the sedentary level of exertion, with certain postural and environmental restrictions.

10)     Based on Plaintiff's age, education, work experience, and residual functional capacity ("RFC"), jobs exist in significant numbers in the national economy that Plaintiff can perform.

11)     Plaintiff, therefore, has not been under a disability, as defined in the Act, from November 19, 2003, through May 30, 2008, the date of the ALJ's decision.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot,

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S EMPLOYMENT AND MEDICAL HISTORY

Plaintiff's past relevant work includes work as a kitchen helper, laundry worker, and maid, and she performed each of these unskilled jobs at either light or medium levels of exertion. On or about October 13, 2003, Plaintiff fell at work, and she presented to Shane Adkison, M.D., for treatment about one month later, on November 19, 2003 (Tr. 259–60, 299). Dr. Adkison referred Plaintiff for magnetic resonance imaging ("MRI") of the left knee (Tr. 260).

The MRI, obtained on November 25, 2003, revealed a medial meniscal tear (Tr. 265–66). Four months later, on March 24, 2004, Plaintiff underwent a partial lateral meniscectomy of the left knee (Tr. 297). The surgery was performed by W. Richard Hooper, M.D. (*id.*). On April 2, 2004, Plaintiff presented to Dr. Hooper for follow-up (Tr. 295). Dr. Hooper noted, in relevant part, that Plaintiff was in need of extensive physical therapy ("PT") "to get mobilized with range of motion," bear weight as tolerated, and progress "to independence using [a] 4-point gait with crutches and then to a cane" (*id.*). In May 2004, Dr. Hooper noted that Plaintiff was "mobilizing a bit with crutches," although her progress was slow (Tr. 287). He recommended continued PT "for strengthening, gait training, and further independence," and he noted that Plaintiff was "still temporary [sic] totally disabled" (*id.*). On June 24, 2004, Dr. Hooper opined that Plaintiff was capable of sedentary work as long as she was not required to lift or carry more than five pounds, squat, stoop, operate a motor vehicle with a clutch, or walk or stand more than one hour a day (Tr. 285).

Upon referral by Dr. Hooper, Plaintiff was examined by Steven Seeker, M.D., on July 28, 2004 (Tr. 282). Plaintiff reported left knee and leg pain that extended from her buttock to her ankle (*id.*). Examination of the left knee revealed no evidence of effusion, no pain over the medial or lateral joint lines, normal ligaments, full extension to 145 degrees of flexion, and stability as to varus and valgus testing at zero and thirty degrees of flexion (*id.*). Additionally, the McMurray test, Lachman test, and anterior and posterior drawer tests were negative (*id.*). Dr. Seeker noted, however, that Plaintiff's straight leg raising test was positive on the left and became "more positive" with dorsiflexion of the left foot, although her contralateral straight leg test was negative, and her leg was neurologically intact (*id.*).[2] Dr. Seeker surmised that Plaintiff's pain was caused by a herniated nucleus pulposus ("HNP") in the lower spine, and he ordered a lumbar MRI (*id.*).

Although it is unclear precisely when the lumbar MRI was obtained, Dr. Karl R. Freydl, D.O., reviewed its results on October 5, 2004, and noted that the images were of markedly suboptimal quality (Tr. 279–80). The MRI appeared to reveal a potential far lateral disc herniation at L5-S1 to the left, although Dr. Freydl stated "it [was] difficult to tell" (*see id.*). A physical examination the same day revealed some muscular trace weakness in the left lower extremity with

---

[2] Examination of Plaintiff's right knee was essentially normal (*see* Tr. 282).

sensation loss and mildly diminished reflex at S1, but knee and ankle jerk reflexes were normal (Tr. 279). A straight leg raising test was positive on the left at approximately sixty degrees, and a Fabere test was also positive (*id.*). After observing Plaintiff's use of crutches (which Dr. Freydl described as "us[ing] a step-through type of gait"), Dr. Freydl explained to Plaintiff a different way to use her crutches (that is, by "using a three point approach, [and] placing the crutch tips down when during [a] stance phase on the left lower extremity"), which he thought would be easier and less traumatic to the lumbar spine (*id.*). He also recommended PT with a focus on abdominal and lower back strengthening (*id.*). On November 24, 2004, Dr. Freydl administered transforaminal epidural steroid injections at L-5, but Plaintiff subsequently reported that they provided no benefit (Tr. 276, 275). And, because the injections provided no pain relief, Dr. Freydl opined that Plaintiff likely had no nerve root impingement (Tr. 275). Dr. Freydl noted that Plaintiff's Lortab "seems to [provide] decent pain relief," and he renewed her Lortab prescription, although he expressed concern that Plaintiff was not using free time available to her "to improve her function," and he recommended that she do so (*see id.*). Dr. Freydl advised Plaintiff that he was leaving the practice, and he transferred her care to another pain management physician (*id.*).

On January 7, 2005, Plaintiff was seen by David E. Fairleigh, M.D., in connection with a worker's compensation claim (apparently related to her fall) (*see* Tr. 337). Plaintiff reported some low back pain, but she primarily complained of left knee pain, which she described as sharp, aching, burning, and shooting (*id.*). She noted that her knee pain increased with sitting, lying down, or changing weather, and it decreased with medication (*id.*). Dr. Fairleigh noted that Plaintiff could not fully bear weight on the left side due to knee pain, but she was ambulatory with the use of crutches (Tr. 338). He reviewed Plaintiff's lumbar MRI, noted it was of poor quality, and stated that "[t]here is a hint of possibility of far lateral disc herniation at the L5-S1 level" (Tr. 339). Plaintiff returned to Dr. Fairleigh on February 18, 2005 (Tr. 336). She again reported back pain and left knee pain, and she stated that her pain was worse with walking or standing but better with medication (*id.*). Dr. Fairleigh administered an injection and advised Plaintiff to return for follow-up in two weeks (*id.*). Dr. Fairleigh continued to treat Plaintiff during 2005 and performed several out-patient procedures in an attempt to alleviate her back pain, including facet injections and thermal radio-frequency ablation (*see, e.g.*, Tr. 352, 368). In April 2005, Dr. Fairleigh noted that Plaintiff

improved with facet injections but continued to have residual pain (Tr. 368).  In May 2005, Plaintiff reported that she was "about 50% better" following an injection, although she noted she still had left knee pain (Tr. 364).  Also in May 2005, Dr. Fairleigh noted that Plaintiff's straight leg raising tests were negative bilaterally (Tr. 365).  In November 2005, Plaintiff reported severe pain and stated that "[a]ggravating factors include everything," and "[i]mproving factors include nothing" (Tr. 355).[3] In December 2005, Dr. Fairleigh discussed with Plaintiff various treatment options including medication, PT, home exercise, and thermal radio-frequency ablation, the latter of which Plaintiff underwent on December 27, 2005 (Tr. 352, 354).

On October 14, 2005, Dr. Fairleigh completed a form for the worker's compensation insurance carrier, on which he opined that Plaintiff was capable of performing sedentary to light jobs "per [the] DOT [Dictionary of Occupational Titles]" (Tr. 393).  On the same form he identified nineteen full-time jobs and two part-time jobs in the local area Plaintiff could perform "within [her] restrictions," including—in relevant part—the jobs of cashier, unarmed security guard, eyeglass salesperson, and customer service representative (Tr. 394–95).

On March 30, 2007, Plaintiff underwent a consultative examination by Leo Chen, M.D., an orthopedic surgeon (Tr. 396).  Dr. Chen reviewed x-rays of Plaintiff's left knee and noted mild degenerative changes, minimal spurring, minimal narrowing of the joint spaces, and no acute bony injury (*id.*).  Upon examination, Dr. Chen noted full range of motion in the cervical spine, shoulders, elbows, wrists, hands, hip, ankles, toes, upper extremities, and right knee (*see* Tr. 397, 399–401). The only limited range of motion (that is, 0–100 degrees, out of a possible 0–150 degrees) noted by Dr. Chen was in the left knee (*see* Tr. 397, 400).  Additionally, Dr. Chen noted that straight leg raising tests were negative, deep tendon reflexes were symmetrical, and Plaintiff had no significant spasm (Tr. 397). Plaintiff displayed "minimal tenderness around her left lumbar paraspinals" and "some subjective numbness down the posterolateral aspect of her left leg into the bottom of her foot" (*id.*).  Dr. Chen opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds

---

[3] Also in November 2005, Dr. Fairleigh noted that, "[Plaintiff] underwent lumbar facet/S1 joint injection with dramatic improvement in symptomatology for the duration of the local anesthetic." (Tr. 355).  Similarly, in December 2005, he noted that the lumbar facet and sacroiliac joint injections provided "significant," but only temporary, relief (Tr. 352).

frequently (Tr. 402).  He stated that Plaintiff had no limitations in her ability to sit or push or pull with the upper extremities, but she was limited (to an unstated degree) in the lower extremities due to left knee and low back pain (Tr. 403).  Although Dr. Chen did not indicate how long Plaintiff could stand or walk in an eight-hour workday, he did opine that a hand-held assistive device was medically necessary for ambulation (Tr. 402).  He further opined that Plaintiff could not climb, but she could occasionally balance, kneel, crouch, crawl, and stoop (Tr. 403).  Finally, Dr. Chen noted that Plaintiff had no manipulative, visual, communicative, or environmental limitations (Tr. 404–05).

In July 2007, Plaintiff began seeing Mary Salib, M.D., for primary care, and she continued to see Dr. Salib through at least April 2008 (*see, e.g.*, Tr. 416, 425 (most remote and most recent treatment records)).  Dr. Salib's records document Plaintiff's reports of back and knee pain, and they generally reflect that Plaintiff was prescribed medication for pain relief, depression, and hypertension (*see, e.g.*, Tr. 411–16, 419, 443).[4]  Dr. Salib's records also indicate that Plaintiff's physical examinations largely resulted in normal findings (e.g., intact strength and sensation in the extremities, no tenderness in the upper and lower right extremities, no signs of edema or cyanosis in the extremities, a steady gait, and normal back examinations), although the left knee was tender, and on one occasion muscle spasms were noted (*see, e.g.*, Tr. 408, 410, 415, 416, 425, 427, 440).  The records also reflect that Dr. Salib often advised Plaintiff to exercise (*see, e.g.*, Tr. 410, 415, 416).  Finally, Dr. Salib filled out two forms on Plaintiff's behalf.  The first is dated July 23, 2007, and it concerns Plaintiff's ability to work (Tr. 406).  Although the form is partially illegible, it reflects Dr. Salib's opinion that Plaintiff was temporarily unable to work (that is, for six months, presumably from July 23, 2007, the date she completed the form, forward) (*id.*).  Dr. Salib also noted that Plaintiff could not carry heavy objects or stand for long periods (*id.*).  The second form, dated October 5, 2007, is an "Impairment Questionnaire," on which Dr. Salib opined that Plaintiff is quite restricted and, essentially, precluded from all employment (*see* Tr. 417–23).

---

[4] One record dated February 28, 2008, while partially illegible, reflects that Dr. Salib prescribed an assistive device for ambulation (*see* Tr. 438; *see also* Doc. 14 at 5).

## V.     ADMINISTRATIVE HEARINGS

Three administrative hearings were held in this case: on May 5, 2006, September 11, 2007, and May 21, 2008 (*see* Tr. 447, 479, 501). Plaintiff was represented by counsel at each hearing. ALJ R.G. Goosens presided at the first and second hearings, and ALJ Ricardo M. Ryan presided at the third hearing (*id.*).

At Plaintiff's initial administrative hearing, ALJ Goosens began by permitting Plaintiff to testify in response to questions posed to her by her counsel (Tr. 447–65). Thereafter, ALJ Goosens questioned Plaintiff (Tr. 465–67), after which counsel was permitted to ask follow-up questions (Tr. 467–68). ALJ Goosens then solicited testimony from vocational expert ("VE") Richard Freeman (*see* Tr. 469). In relevant part, ALJ Goosens asked VE Freeman to consider whether a hypothetical individual of Plaintiff's age (forty-seven), education, and work experience, with the limitations assessed by a non-examining state agency physician in August 2004, could perform Plaintiff's past relevant work (*see* Tr. 469–70). In response, VE Freeman testified that such an individual could not perform Plaintiff's past relevant work because the assessed limitations essentially precluded work at any exertional level other than <u>sedentary</u> (as previously noted, Plaintiff's past work was performed at light or medium exertional levels) (*see* Tr. 470). VE Freeman further testified that the hypothetical individual could perform available sedentary work, and he identified "representative samples" of such available work, including surveillance system monitor, parking lot booth cashier, gate tender, cashier, and information clerk (Tr. 471). VE Freeman emphasized that the jobs he identified were not "exclusive" but rather representative of sedentary jobs available in the regional economy that the hypothetical individual could perform (*see* Tr. 471–72). ALJ Goosens then asked VE Freeman to consider the same hypothetical individual but with the limitations assessed by a non-examining state agency physician in March 2005 (*see* Tr. 472).[5] VE Freeman testified that such a

---

[5] The limitations assessed in March 2005 are more restrictive than those assessed by the non-examining agency physician in August 2004. The March 2005 limitations are as follows: 1) lift and carry twenty pounds occasionally and ten pounds frequently; 2) stand or walk at least two hours in an eight-hour work day, with normal breaks; 3) sit six hours in an eight-hour work day, with normal breaks; 4) push and pull with the upper extremities and lower right extremity without limitation (but limited with regard to lower left extremity); 5) stoop, kneel, crouch, and crawl occasionally but not climb anything other than ramps or stairs ("postural limitations"); and 6) no concentrated exposure to hazards, such as machinery and heights ("environmental limitations") (Tr. 341–47). As can be seen, the March 2005 limitations are generally consistent with the limitations assessed by Dr. Chen, although Dr. Chen did not specifically state how long

person could perform the same jobs he previously identified, and he noted that the postural and environmental limitations assessed by the agency physician in March 2005 did not change his answer[6] (*id.*). ALJ Goosens then allowed Plaintiff's counsel to question VE Freeman (*id.*). In relevant part, counsel asked whether his opinions would change if the hypothetical individual required "a cane for effective ambulation" (Tr. 474). VE Freeman opined that his opinion would be the same because the jobs he identified did not require a significant amount of walking; in other words, according to VE Freeman, the "cane is not considered limiting" as to those jobs (*see id.*). Likewise, VE Freeman opined, "the sedentary occupation base would [not] be eroded based on the use of the cane for ambulation" (*id.*).

At Plaintiff's second hearing, held in September 2007, ALJ Goosens again opened the hearing by providing Plaintiff's counsel with an opportunity to question Plaintiff (*see* Tr. 482). In response to those questions, in relevant part, Plaintiff testified that she lives in a trailer and uses a ramp to enter the trailer (she noted she previously used stairs to enter but could no longer climb them) (Tr. 483). She also testified that she still uses an assistive device for ambulation, and she has not been advised by Dr. Salib to discontinue use of the device (Tr. 484). ALJ Goosens then briefly questioned Plaintiff, and thereafter he again called VE Freeman to testify (Tr. 486). ALJ Goosens asked VE Freeman whether the limitations assessed by Dr. Chen in March 2007 would change the testimony/answers he provided at Plaintiff's previous hearing (*see* Tr. 487). In response, VE Freeman testified that a person with the limitations described by Dr. Chen could perform all of the jobs he identified during his earlier testimony (Tr. 487–88). In explaining his answer, VE Freeman noted that Dr. Chen essentially limited Plaintiff to sedentary work, which limitation was compatible with the jobs he identified at the first hearing (all of which are sedentary and unskilled jobs) (*see* Tr. 488). Plaintiff's counsel was then permitted to ask follow-up questions of VE Freeman (Tr. 489). During this questioning, VE Freeman specifically testified that he considered Dr. Chen's opinion

---

Plaintiff could stand or walk, and he additionally opined that Plaintiff would need an assistive device for ambulation.

[6] The opinions rendered by the non-examining agency physician in August 2004 included no postural or environmental limitations (*see* Tr. 267–74).

that Plaintiff requires an assistive device to ambulate, and he stated that this requirement has "no effect" on the sedentary job base with regard to the jobs he identified (*see* Tr. 487–91, 494).

Finally, at Plaintiff's third hearing, in May 2008, Plaintiff appeared before ALJ Ryan, who explained that ALJ Goosens was no longer available and that he would complete the adjudication of Plaintiff's claim (*see* Tr. 503). ALJ Ryan confirmed with Plaintiff's counsel that Dr. Salib's records had been submitted, including her October 2007 questionnaire (*id.*). The ALJ then made a comment regarding Dr. Salib, namely, that she had taken no x-rays and "really should not be giving class III narcotics without any objective findings" (*id.*). Plaintiff's counsel responded to ALJ Ryan's comment by pointing out that Dr. Salib was provided with Plaintiff's treatment records and presumably had reviewed them in light of her comments on the October 2007 questionnaire (*id.*).[7] The transcript suggests that ALJ Ryan did not agree with counsel's assertion (i.e., that the comments made by Dr. Salib on the questionnaire demonstrate that she reviewed Plaintiff's pertinent medical records before prescribing narcotics), although he did not directly state he disagreed with the assertion. Nevertheless, ALJ Ryan included Dr. Salib's treatment records and questionnaire in the record, and after asking Plaintiff's counsel if there was "[a]nything else," to which counsel responded "no," ALJ Ryan closed the hearing (Tr. 505).

VI.    DISCUSSION

In the instant appeal Plaintiff raises three grounds for relief, which for its convenience the court organizes and considers in the following order: Ground One, Erosion of the Sedentary Occupational Base; Ground Two, Full and Fair Evidentiary Hearing; and Ground Three, Mechanical Application of the Grids.

●    Grounds One and Two

The court addresses Plaintiff's first two grounds for relief together because each requires consideration of the evidence adduced at the three administrative hearings.

Erosion of the Sedentary Occupational Base

---

[7] *See* Tr. 423 (Dr. Salib opining on questionnaire that Plaintiff's limitations commenced approximately three years earlier "as per medical records"), and Tr. 418 (Dr. Salib referencing x-rays and MRI results on the questionnaire).

In Ground One Plaintiff asserts the ALJ erred by failing "to follow the law and regulations regarding [] erosion of the sedentary occupational base" when a claimant has non-exertional impairments (*see* Doc. 14 at 7). More specifically, Plaintiff submits the ALJ erroneously failed to consider the effect of her required use of a cane, asserting that such use prevents her from performing the "full range of sedentary work" (*id.* at 11). According to Plaintiff, the ALJ failed to comply with section DI 25025.020 of the Program Operations Manual System ("POMS").[8] Moreover, Plaintiff contends, "it is highly unlikely that there truly was no erosion of the sedentary job base," as VE Freeman testified (*see* Doc. 14 at 12).

VE Freeman was specifically asked whether Plaintiff could perform the jobs he identified (i.e., surveillance system monitor, parking lot booth cashier, gate tender, cashier, and information clerk) if she requires a cane for effective ambulation. VE Freeman responded affirmatively, noting the jobs he identified do not require a significant amount of walking. VE Freeman also opined that the sedentary occupational base would not be eroded, based on Plaintiff's need to use a cane, since those jobs do not require much walking (*see* Tr. 474).[9] Although Plaintiff contends "it is highly unlikely that there truly was no erosion of the sedentary job base" (Doc. 14 at 12), her contention is unsupported and speculative, and it conflicts with the expert testimony provided by VE Freeman. Moreover, VE Freeman's testimony is fully consistent with the POMS, which indicates in relevant part that: 1) the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability; 2) if a medically required hand-held assistive device is needed only for prolonged ambulation, the unskilled sedentary occupational base will not ordinarily be significantly eroded; and 3) the use of an assistive device due to impairment in only one lower

---

[8] "The POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits." (https://secure.ssa.gov/apps10/ (last visited February 17, 2011)). Although POMS and Social Security Rulings do not have the force and effect of law, those rulings that are a reasonable and permissible interpretation of the Social Security Act will be given deference by the courts. Stroup v. Barnhart, 327 F.3d 1258, 1262 (11th Cir. 2003); Fair v. Shalala, 37 F.3d 1466 (11th Cir. 1994).

[9] The full sedentary occupational job base is eroded—in varying degrees—when a claimant has exertional or non-exertional impairments (or both). *See* POMS § DI 25025.020(B).

extremity (like Plaintiff's) less erodes the sedentary occupational base than use of such a device due to impairment in both lower extremities. *See* POMS § DI 25025.020(B).[10]

Additionally, the ALJ did not err in concluding, based on VE Freeman's testimony, that Plaintiff could perform available sedentary jobs. As this court is well aware, an ALJ may rely solely on the testimony of a VE in determining whether work is available in significant numbers in the national economy that a claimant is able to perform, as long as the ALJ has posed a hypothetical question to the VE that includes all of the claimant's impairments. *See, e.g.,* Miller v. Comm'r of

---

[10]  Section DI 25025.020 provides, in relevant part, as follows:

When there is a reduction in an individual's exertional [] capacity [e.g., due to the use of a cane] such as so that he or she is unable to perform substantially all of the [200 unskilled sedentary] occupations . . . , the individual will be unable to perform the full range of sedentary work: the occupational base will be eroded by the additional limitations or restrictions. However, the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability. There may be a number of occupations from the approximately 200 occupations [], and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded.

* * *

**Medically required hand-held assistive device**: To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded. Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. (Bilateral manual dexterity is needed when sitting but is not generally necessary when performing the standing and walking requirements of sedentary work.) For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

POMS § DI 25025.020(B) (eff. 1/31/07) (bolded emphasis in original; underlined emphasis added), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425015020 (last visited February 17, 2011).

Case No. 3:09cv509/LAC/EMT

Soc. Sec. Admin., 246 Fed. Appx 660, 661 (11th Cir. 2007) (citing Jones v. Apfel, 190 F.3d 1224, 1229–30 (1999)); *see also* POMS § DI 25025.020(B)(8) (an ALJ "may use the resources [and testimony] of a vocational specialist or vocational expert," including with respect to erosion of the unskilled sedentary occupational base). Although the ALJ did not include in his hypothetical questions Plaintiff's need to use a cane, Plaintiff's counsel included the restriction in follow-up questions posed to VE Freeman. Thus, the ALJ did not err in relying on the VE's testimony—which was based on hypothetical questions that included all of Plaintiff's restrictions—regarding Plaintiff's ability to perform certain sedentary unskilled work <u>and</u> the availability of such work.

Finally, in a related argument, Plaintiff contends the ALJ erred by failing to include Plaintiff's need to use a cane in the RFC and, similarly, by accepting the opinions of Dr. Chen but failing to include in the RFC Dr. Chen's specific opinion that Plaintiff requires an assistive device for ambulation (Doc. 14 at 13). Although the ALJ failed to include this restriction in the RFC, he specifically noted VE Freeman's testimony that his opinions would not change even if Plaintiff's use of a cane is medically necessary (*see* Tr. 39). Thus, any error by the ALJ in failing to deem the cane medically necessary or include restrictions related to its use in the RFC (*see* Tr. 36) was harmless. *See* Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . ."); Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error doctrine in the context of a social security case). In short, nothing in the record suggests that Plaintiff's use of a cane prevents her from performing the sedentary work identified by the VE. Accordingly, Plaintiff is not entitled to relief on this ground.

<u>Full and Fair Evidentiary Hearing</u>

In Ground Two, Plaintiff asserts the ALJ erred by failing to provide a full and fair administrative hearing (Doc. 14 at 13–14). More particularly, Plaintiff contends ALJ Ryan erred by depriving her of "due process rights" when he abruptly closed the third hearing "without giving her the opportunity to testify or without giving her representative the opportunity to the question the VE on the limitations that had been added to the claim file since the previous hearing [i.e., those

limitations assessed by Dr. Salib]" (*see id.*). Upon review of the record, the undersigned concludes that Plaintiff is not entitled to relief on this ground.

Initially, as outlined above, the transcript reflects that when the parties convened for Plaintiff's third hearing ALJ Ryan incorporated into the record Dr. Salib's treatment records and her October 2007 questionnaire. Although ALJ Ryan's comment regarding Dr. Salib's course of treatment was gratuitous and thus unnecessary, after this comment and prior to closing the hearing ALJ Ryan asked Plaintiff's counsel if there was "anything else," and counsel responded "no." Thus, the record does not support Plaintiff's assertions that the third hearing was abruptly closed or that ALJ Ryan gave Plaintiff no opportunity to testify. Indeed, there is no indication in the record that Plaintiff expressed a desire to testify at the third hearing, much less that she was prevented from testifying. Moreover, the record establishes that Plaintiff testified without ALJ-imposed limitations at her earlier hearings and that ALJ Ryan considered her testimony in his decision (*see* Tr. 32, 35–36). The record likewise fails to support a finding that ALJ Ryan prevented Plaintiff's counsel from questioning Jody Skinner, a VE present at Plaintiff's third hearing (*see* Tr. 501, 505).[11] And, even if ALJ Ryan erred by failing to solicit testimony from VE Skinner based on Dr. Salib's opinions (or by failing to explicitly invite counsel to do so), any such error is harmless. As noted *supra*, Dr. Salib's opinions regarding Plaintiff's abilities are quite restrictive and, if deemed credible, would likely preclude Plaintiff from all work. ALJ Ryan, however, discounted Dr. Salib's opinions, concluding in relevant part that they are not corroborated by her own treatment records and are inconsistent with the opinions of two treating physicians (Drs. Hooper and Fairleigh) and those of Dr. Chen, an orthopedic specialist and consultative examiner (Tr. 35).[12] Thus, having properly discounted the opinions of Dr. Salib, any failure to obtain VE testimony based on her opinions had no effect on ALJ Ryan's decision denying benefits.

● Ground Three

---

[11] The record contains no indication that counsel asked permission to question the VE, attempted to question the VE, or otherwise expressed any desire to obtain testimony from the VE. Moreover, the fact that a VE was present at the third hearing suggests a likelihood that the ALJ would have permitted the VE to testify.

[12] Plaintiff does not contest the ALJ's findings regarding Dr. Salib's opinions.

As Plaintiff's last claim for relief, she contends the ALJ erred by "mechanically" applying the Grids, or the Medical-Vocational Guidelines, to find her "not disabled" (Doc. 14 at 7–11). Plaintiff notes that ALJ Ryan issued his decision on May 30, 2008, when she was forty-nine years of age and considered "a younger individual," but that on October 8, 2008—more than four months after his decision—she turned fifty, at which time she was considered "a person closely approaching advanced age."[13]  According to Plaintiff, because at the time ALJ Ryan issued his decision her age was in "borderline" status—and because she needs an assistive device to ambulate, which reduces her ability to perform sedentary work—instead of applying Grid Rules 201.18 and 201.21 to find her "not disabled" ALJ Ryan should have applied Grid Rule 201.12 to find her "disabled" (*id.* at 8).

At the fifth step of the sequential analysis, the ALJ considers the claimant's RFC, age, education, and work experience to determine if other work is available in significant numbers in the national economy that the claimant can perform. Phillips v. Barnhart, 357 F.3d 1232, 1239–40 (11th Cir. 2004); Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002).  "There are two avenues by which the ALJ may determine whether the claimant has the ability to adjust to other work in the national economy."  Phillips, 357 F.3d at 1239.  The ALJ may either apply the Grids or he may consult a VE, by posing hypothetical questions to establish whether an individual with the claimant's impairments would be able to find employment.  *Id.* at 1239–40.  In applying the Grids, the ALJ has the discretion to determine whether, under the circumstances of the particular case before him, a claimant's age should be considered borderline, and if so, which Grid Rule(s) should be applied.  *See* 20 C.F.R. § 404.1563(b).[14]  There are no fixed guidelines as to when a borderline situation exists.  *See* Social Security Ruling 83-10; *see also* 20 C.F.R. § 404.1563(b) (a borderline

---

[13]  The regulations provide that a "younger person" is one aged 18–49, and that a "person closely approaching advance age" is one aged 50–54.  *See* 20 C.F.R. § 404.1563(c)(d).  Thus, Plaintiff was a "younger person" from November 19, 2003, the date she alleges she became disabled, through May 30, 2008, the date of the ALJ's decision (and some four months beyond); she was a "person closely approaching advanced age" as of October 8, 2008.

[14]  20 C.F.R. § 404.1563(b) in part provides that the SSA "will not apply the age categories mechanically in a borderline situation.  If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case."  20 C.F.R. § 404.1563(b).

situation exists when the passage of "a few days to a few months" would cause a shift in results).[15]
Regardless, the Grids should not be relied upon exclusively (or, as Plaintiff contends here, "applied
mechanically") either "when the claimant is unable to perform a full range of work at a given
residual functional level or when [she] has non-exertional impairments that significantly limit basic
work skills." Phillips, 357 F.3d at 1242 (quotation marks, alterations, and emphasis omitted). If the
claimant cannot clearly do unlimited types of work at the exertional level in question, a VE must be
called. See Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).

Although at the time of ALJ Ryan's decision Plaintiff was approximately four months and
one week away from moving into an older age category for purposes of applying the Grids—and
thus arguably in the zone of borderline cases—there was no error in the ALJ's failing to treat
Plaintiff's age as being in borderline status and to rely on the Grids to determine her disability status.
ALJ Ryan noted in his decision that if Plaintiff had the RFC "to perform the full range of sedentary
work," a finding of "not disabled" would be directed by Grid Rules 201.18 and 201.21; the ALJ
found, however, that Plaintiff could not perform the full range of sedentary work (see Tr. 38). More
specifically, ALJ Ryan determined that certain of Plaintiff's impairments necessarily eroded the
sedentary occupational base. He therefore properly concluded that VE testimony was necessary to
determine whether jobs existed that Plaintiff—with her impairments—could perform (id.). VE
Freeman's testimony was that Plaintiff's need to use an assistive device to walk did not compromise
her ability to perform the five sedentary, unskilled jobs he identified. Relying on this testimony,
ALJ Ryan correctly concluded that Plaintiff was not disabled because jobs existed which she could

---

[15] Courts have considered whether a "borderline situation" exists in a variety of contexts. Compare, e.g., Kane
v. Heckler, 776 F.2d 1130, 1132–33 (3d Cir. 1985) (forty-eight days before next age category within borderline
situation); Ford v. Heckler, 572 F. Supp. 992, 994 (E.D.N.C. 1983) (two months within borderline); Hilliard v.
Schweiker, 563 F. Supp. 99, 101–02 (D. Mont. 1983) (less than three months within borderline); Hill v. Sullivan, 769
F. Supp. 467, 471 (W.D.N.Y. 1991) (three months, two days within borderline), with Underwood v. Bowen, 828 F.2d
1081, 1082 (5th Cir. 1987) (ten months not within borderline); Lambert v. Chater, 96 F.3d 469, 470 (10th Cir. 1996)
(seven months not within borderline). See also Crook v. Barnhart, 244 F. Supp. 2d 1281, 1283–84 (N.D. Ala. 2003)
(borderline status may exist if claimant is six months or less away from an older age category).

perform (*id.*).[16]  Thus the ALJ did not err by failing to rely on Grid Rule 201.12 because he was required to obtain VE testimony in this case; moreover, his conclusion that Plaintiff is "not disabled" is supported by substantial evidence in the form of VE Freeman's opinion.

VII.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, reversibly erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED**, and that the clerk be directed to close the file.

At Pensacola, Florida this 24th day of February 2011.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

---

[16] As previously discussed (but in a different context), ALJ Ryan did not err in relying on VE Freeman's testimony, even though his testimony was obtained in September 2007, because the only evidence added to Plaintiff's file since his testimony was from Dr. Salib, and her opinions were properly discounted.

Case No. 3:09cv509/LAC/EMT